## W.G. PETTIGREW DISTRIBUTING COMPANY and Pettigrew Distributing Company, Inc., Plaintiffs,

v.

## BORDEN, INC., Defendant.

### Civ. A. No. G–95–147.

United States District Court, S.D. Texas, Galveston Division.

Aug. 30, 1996.

Order Denying Motion to Alter or Amend Nov. 26, 1996.

Thomas R. Fox, Kleberg & Head, Houston, TX, for Plaintiffs.

Arthur M. Meyer, Jr., Richard A. Illmer, Brown McCarroll & Oaks Hartline, Dallas, TX, for Defendant.

### ORDER

GIBSON, District Judge.

Before the Court is Defendant's Motion for Summary Judgment. Plaintiffs W.G. Pettigrew Company ("W.G.") and Pettigrew Distributing Company, Inc. ("PDI"), seek damages from Defendant Borden, Inc., for breach of contract, conversion, tortious interference with contract, unfair competition, predatory pricing and slander. In this diversity action, the six causes of action are brought pursuant to Texas law. Defendant requests summary judgment on all claims. Pending also is Plaintiffs' motion to dismiss without prejudice the claims for predatory pricing, slander and unfair competition. The motion to dismiss is opposed because Defendant wants the claims rejected with finality rather than without prejudice to refiling.

### Background

After working as a Borden employee for six years, W.G. Pettigrew became an independent distributor of Borden dairy products in 1941. Operating under the name W.G. Pettigrew Distributing Company, a sole proprietorship, he served customers in Brazoria, Matagorda and Galveston Counties, Texas. Sometime during the mid–1940's, W.G. hired his brother, Delmar, to service some of the delivery routes. Delmar claims he became an independent Borden distributor in 1948. Since incorporating his business under Texas law in 1988, Delmar has operated under the name Pettigrew Distributing Company, Inc. Borden knew that Delmar serviced some of W.G.'s routes but asserts that no contractual relationship has ever existed between Borden and Delmar (or between Borden and PDI), and that Delmar (PDI), in actuality, was at all times an employee or independent contractor for W.G.

From the beginning, oral rather than written agreements governed the relationship between Borden and W.G. The general terms of the initial arrangement are not in dispute. W.G. and other "independent distributors" would purchase dairy products from Borden at "dock" prices set by Borden. They would then sell and deliver the products to customers in areas outlying Houston, Texas, with the distributors free to set the prices charged to their own customers. Although distributors had routes designated by numbers for records purposes and each concentrated service in a particular geographic region, Borden policy did not allow exclusive territorial assignments. W.G. also made deliveries to customers Borden dealt with directly and for each merchandise transfer to these customers W.G. was paid a "hauling charge."

As an independent contractor, W.G. owned and maintained his own delivery vehicles. At first he made all the deliveries himself. As

the routes expanded, he first hired his brother, then other drivers, to service his customers. By 1994, according to W.G., the Pettigrews' business assets included ten route trucks, two tractor/trailer rigs and two storage vaults.

During the course of their half-century long relationship, Borden modified the terms of the arrangement with W.G. and the other independent distributors numerous times. The dock prices were changed from time to time based upon the cost of raw milk and other economic factors, including competition. Borden also varied the amount which would be credited to W.G.'s account as a "returns" allowance to compensate for losses from broken bottles, spoiled milk, out-of-date products and the like. Additionally, Borden would provide various temporary rebates and allowances as special incentives to assure that Borden products would remain competitive.

The only written document in evidence describing the relationship between Borden and W.G. is a two-page memorandum prepared and promulgated by Borden in 1973. The memo was generated in response to an investigation of Borden's milk delivery system by the Texas Department of Public Safety and broadly outlined how Borden would deal with its independent distributors. It can best be characterized as a policy statement. In fifteen number paragraphs, the memo declared, *inter alia*, that distributors would take title to products at the dock and would be responsible for all order-taking, pricing and billing of their customers; that all customers outside the Houston commercial zone formerly considered Borden customers would become the distributors' customers and there would be *no more* "hauling charges;" and, that Borden would continue to accept returns for defective merchandise, spoils and leakers, would continue to pay an advertising and display allowance, and would provide assistance in the preparation of school bids. The memo did not address financial details of the Borden-distributor relationship, such as product pricing, the allowance/incentive payments schedule or the criteria to be utilized for determining the amount of financial assistance available to distributors. Significantly, the memo did not specify the duration of its effect.

After 1973, Borden and W.G. continued to operate much as before, with dock prices and allowances to distributors modified intermittently by Borden. Despite the declaration in the 1973 memo that Borden would not have route customers of its own outside the Houston commercial area, the practice of dealing directly with some outlying customers and paying hauling fees to distributors for deliveries to these customers was re-instituted by Borden. The summary judgment evidence does not indicate when, after 1973, Borden re-adopted this practice.

The Pettigrews assert that, starting in 1988, Borden "began exercising control over" many of the Pettigrews' existing customers by setting prices, invoicing customers, using Borden field representatives to service these customers and setting guidelines that the distributor route salesmen were required to follow. At some point in time, Borden began to negotiate with certain large grocery store chains. According to Borden, these major, high-volume customers demanded to deal with Borden directly. In 1991, Borden began competing with the Pettigrews for retail and grocery store accounts and started taking away the various credits and adjustments previously allowed.

In 1994, Borden announced that virtually all of the financial assistance previously provided to independent distributors was being terminated and that a new hauling fee schedule would be instituted. W.G. objected and asked Borden to either purchase the entire distributorship or purchase the haul accounts. Borden refused, but after negotiating with W.G., offered to provide certain financial assistance. The offer was reduced to writing in the form of a letter from Borden General Manager Bryan Conaway to W.G. dated November 11, 1994. Both Borden and W.G. refer to the terms memorialized in the letter as an "agreement." W.G., however, was not completely satisfied with the provisions as stated in the November 11 letter, and in a note dated November 15, requested that Borden amend the agreement to alter somewhat the basis for calculating the spoilage allowance and to clarify the contract provision pertaining to the "returns" credit. Borden rejected these proposed

changes. W.G. continued to make deliveries and accepted payments pursuant to the terms of Borden's November 11 letter.

On December 8, W.G. advised Borden in writing of his intention to terminate the distributorship relationship effective January 15, 1995. W.G. declared that, as a result of the direct competition and the many changes unilaterally imposed by Borden, his distributorship had become unprofitable and his only remaining option was to go out of business. After W.G. signaled his intention to cease doing business with Borden, Delmar made a request to Borden that he (or PDI) be designated an independent distributor. Borden denied the request and, within a few weeks after W.G. went out of business, Delmar became an independent distributor for Land O' Pines, a dairy products company in direct competition with Borden.

The Pettigrews filed the instant lawsuit on March 21, 1995. Borden's summary judgment motion was filed February 2, 1996, a week before the discovery deadline specified in the Court's scheduling order.

*Objections to Summary Judgment Evidence*

Borden and the Pettigrews submitted summary judgment briefs and evidentiary material, including deposition transcripts, affidavits, answers to interrogatories and business records, for consideration by the Court. Both sides now raise objections to portions of the material tendered. Some objections contest admissibility based on the rules of evidence and Fifth Circuit case law. Others challenge particular statements in the affidavits because they allegedly raise issues which properly should have been revealed during discovery or contradict evidence divulged during discovery.

■ Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial. *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995). *But see Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators,* 563 F.2d 205, 213–14 (5th Cir.1977) (inadmissible material considered by court without objection may support summary judgment). The Court, however, has authority to exclude evidence based on a party's failure to comply with discovery deadlines set in the Court's

scheduling order. *Geiserman v. MacDonald,* 893 F.2d 787, 790 (5th Cir.1990). Exclusion of evidence also may be based upon a party's failure to supplement discovery responses as required by Federal Rule of Civil Procedure 26(e). *Murphy v. Magnolia Elec. Power Ass'n,* 639 F.2d 232, 234 (5th Cir.1981). *See also Reed v. Iowa Marine and Repair Corp.,* 16 F.3d 82, 84 (5th Cir.1994) (discussing criteria for imposing sanctions).

■ First, the Pettigrews object to "the use of W.G. and PDI's answers to interrogatories because there a numerous objections lodged therein that have not been ruled on by the Court." *Pls.' S/J Response* at 9 (*referring to Def.'s Exs. I and L* ). Apparently the Pettigrews want the Court to disregard all their interrogatory answers even though they only registered objections to some of the questions. To support their contention that the interrogatories are "incompetent trial or summary judgment evidence," the Pettigrews cite *Pan–Islamic Trade Corp. v. Exxon Corp.,* 632 F.2d 539, 552 (5th Cir. 1980), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). Nowhere in the *Pan–Islamic Trade* case, however, does the Fifth Circuit state or imply that a set of interrogatories becomes inadmissible simply because the answering party objects to some of the queries. Rather, the portion of *Pan–Islamic Trade* cited by the Pettigrews holds that, if a party wants to compel answers to interrogatories, that party should file a motion specifying precisely what was sought to be compelled and why such compulsion was justified. *Id.*

Procedural rules explicitly provide that the Court may consider answers to interrogatories in determining whether summary judgment should be granted. *See* FED.R.CIV.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–22, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 272–73 (1986). In a summary judgment proceeding, where the evidence is before the Court rather than a jury, the Court can easily consider objections while examining the evidence. A rule such as the Pettigrews propose would have a predictable and detrimental result: an answering party could always register an objection to at least one interrogatory for the sole purpose of making

the entire set of answers subject to a challenge on admissibility grounds. The Pettigrew's position, that the entire set of interrogatory responses should be ignored, is simply untenable.

■ Next, the Pettigrews object to paragraphs 3, 5 and 7 of Brian Conaway's affidavit. Paragraphs 3 and 5 allegedly contradict a portion of Conaway's deposition testimony. While being deposed, Conaway said he did not have personal knowledge about the relationship between the Pettigrews and Borden until 1994, when he became General Manager of Borden's Conroe, Texas operation. *Conaway Dep. (Attachment to Pls.' S/J Response)* at 99. Paragraph 3 of the affidavit describes what he knew of the relationship "as General Manager." *Conaway Aff. (Def.'s Ex. D)* at 2. The information provided in the affidavit does not conflict with the deposition testimony so as to provide a basis for a valid objection. Conaway's paragraph 5 statement, that "he was not aware of" any written contract, likewise is not objectionable. *Id.* The Court, of course, will not infer from Conaway's statement that any particular type of contract, written or oral, did or did not existed between Borden and the Pettigrews.

■ The objection to paragraph 7 of the affidavit is based on the hearsay rule. *See* FED.R.EVID. 802. An affidavit must be made on personal knowledge and shall set forth such facts as would be admissible in evidence. FED.R.CIV.P. 56(e); *BMG Music v. Martinez,* 74 F.3d 87, 90 n. 18 (5th Cir.1996). Paragraph 7 does include hearsay:

> Over the last five years, Borden has lost market share in the relevant geographic and product markets. According to the Information Resources, Inc. (IRI) reports Borden receives on a regular basis, Borden currently holds a market share of approximately 16% in the relevant geographic market. Borden has many competitors in the area, including Oak Farms, Land O'Pines, Hygeia, Schepps, and others. Borden also distributes private and generic secondary labeled products.

*Conaway Aff.* at 2–3.

To the extent that Conaway relates information contained in the IRI report, a document not in evidence, Conaway's statement will be disregarded. The remainder of the paragraph, however, appears to be based on personal knowledge acquired during Conaway's many years as a Borden supervisor and manager. *See Id.* at 1–2. Accordingly, to the extent that Conaway describes generally the competition faced by Borden in the marketplace and Borden's distribution of private and generic products, the statement is admissible.

■ Finally, the Pettigrews object to paragraphs 5, 6, and 8 of Michael J. Stripling's affidavit because, they claim, it contradicts his deposition testimony denying first-hand knowledge of the Pettigrews' relationship with Borden. Stripling testified at deposition that he had no personal knowledge of the relationship Borden had with its independent distributors other than those relating to accounting functions. *Stripling Dep. (Attachment to Pls.' S/J Response)* at 1–9, 110. In the affidavit, Stripling clearly qualifies his statements by declaring that his observations are from "an accounting perspective." *Stripling Aff. (Def.'s Ex. E)* at 2. The objections to the Stripling affidavit, accordingly, are overruled.

■ Borden, for its part, objects to the affidavits of W.G. and Delmar Pettigrew and move that they be stricken. *See W.G. Pettigrew (WGP) Aff. and Delmar Pettigrew (DP) Aff. (Attachments to Pls.' S/J Response).* As part of the discovery process, the Pettigrews were asked to specify, in answer to written interrogatories and during their depositions, all the actions by Borden claimed to constitute breach of contract or tortious interference with contracts. Long after discovery was closed, the Pettigrews prepared their own affidavits and tendered them to support their response to Borden's summary judgment motion. These affidavits, according to Borden, seek to introduce facts and raise new claims that should have been divulged in response to discovery requests.

■ For matters that were the subject of specific discovery requests, the Pettigrews clearly had an obligation to supplement their discovery responses. FED.R.CIV.P. 26(e). Claims or facts that should have been reveal during discovery, and are later raised by means of affidavits, are clearly inappropriate. The affidavits, on the other hand, should not

be completely disregarded merely because certain portions of them may be objectionable or are not in a form admissible at trial. *See Fowler,* 68 F.3d at 126 (*citing Salas v. Carpenter,* 980 F.2d 299, 304 (5th Cir.1992)). *See also Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Accordingly, for summary judgment purposes, the Pettigrews' affidavits will be given consideration to the extent that they do not attempt to introduce matters that properly should have been brought to Borden's attention in the original or supplemental answers to Borden's discovery requests.

▪ Borden also objects to portions of Delmar's deposition testimony that relate how customers told him that a Borden salesman made statements such as, "The Pettigrews were retiring and getting out of the dairy business." *See, e.g., DP Dep.* at 420, 436–42. Neither argument nor evidence is proffered to explain how these statements fall within one of the exceptions to the hearsay rule. Moreover, the Pettigrews had ample time during the pretrial discovery process to unearth evidence, if any existed, to corroborate the hearsay statements. The Court finds the statements inadmissible hearsay.

*Standard of Review*

Summary judgment is appropriate if the record, judged in the light most favorable to the nonmoving party, discloses that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 321–22, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 272–73. The nonmoving party then has the burden of showing the existence of a specific factual issue which is disputed. *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.,* 55 F.3d 181, 184 (5th Cir.1995).

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial. If any element of the plaintiff's case lacks factual support, the district court should grant summary judgment. In such a situation, there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552, 91 L.Ed.2d at 273.

In addition to claiming that the Pettigrews fail to provide factual support for establishing all the required elements of their claims, Borden raises several affirmative defenses to the Pettigrews' causes of action. On these defensive claims, Borden would have the burden of proof at trial. As a consequence, for the affirmative defenses, Borden has the burden on summary judgment to establish each element as a matter of law. *Crescent Towing & Salvage Co. v. M/V Anax,* 40 F.3d 741, 743 (5th Cir.1994).

*Breach of contract*

▪ At the heart of this lawsuit are the Pettigrews' breach of contract claims. The essential elements of a breach of contract action are: 1) the existence of a valid contract; 2) compliance with its terms by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff as a result of the breach. *Landrum v. Devenport,* 616 S.W.2d 359, 361 (Tex.Civ.App.— Texarkana 1981, no writ).

▪ The parties do not genuinely dispute that some type of contractual relationship existed between Borden and W.G.; the controversy is over its terms. On the other hand, Borden denies that any contractual agreement ever existed between Borden and PDI. To support the contention that PDI had a contractual relationship with Borden, the Pettigrews rely on three documents: their own affidavits and the deposition transcript of Darrell Joslin, a former Borden employee. The Pettigrews assert, in conclusory fashion,

that Delmar (PDI) was an independent Borden distributor. Other than their own impression concerning the nature of the relationship, the only factual basis for this belief revealed during their depositions is the uncontroverted assertion that Borden made out several checks payable to "D.M. Pettigrew." *See DP Dep.* at 199. These checks alone, however, do not demonstrate a contractual relationship. Moreover, even if the testimony about the checks supported the inference that Delmar, at some time, had a relationship with Borden, it does not establish any elements of PDI's claim. Inasmuch as PDI is the plaintiff, PDI must show *prima facie* that the corporate entity PDI, not just Delmar individually, had a contractual relationship with Borden. Subjective and self-serving statements and the testimony that a few checks were made out to Delmar are, by themselves, insufficient to establish, or create the basis for a reasonable inference, that a contractual relationship existed between Borden and PDI.

Joslin, at his deposition, said that he considered Delmar a "distributor." *Joslin Dep. (Attachment to Pls.' S/J Response)* at 22–24. Of course, it is uncontroverted that Delmar delivered Borden dairy products and, as such, could have been referred to as a "distributor." Joslin, however, was not questioned about the type of contractual relationship, if any, existing between Delmar or PDI and Borden. Because the question of a contractual relationship was not addressed, Joslin's deposition testimony does not provide the basis for an inference that a contract either did, or did not, exist between Borden and PDI.

Borden presents a convincing case that PDI did not have the status of "independent distributor," that is, having a direct employment or contractual relationship with Borden. For one thing, even after discovery, PDI failed to produce any documentary evidence confirming a direct relationship with Borden. For another, the evidence establishes that PDI did not make purchases directly from Borden and Borden did not make payments to PDI; rather, the purchase and payment transactions were with W.G., excepting a few checks made out to "D.M. Pettigrew." *See WGP Dep.* at 24, 499–515; *DP Dep.* at 103–109, 199. Borden never established or maintained an account on behalf of either Delmar or PDI. *DP Dep.* at 102; *Stripling Aff.* at 2. Further, although provisions of the 1973 memo arguably became terms of an agreement between Borden and its distributors, it is noteworthy that Delmar was neither invited to the meeting where the memo was circulated and discussed with W.G. and the other independent distributors, nor was Delmar sent a copy of the memo. *DP Dep.* at 22.

In spite of Borden's evidence, PDI might have raised a fact issue by establishing, or at least providing some evidence from which to infer, the elements necessary for the formation of a valid contract. *See Hallmark v. Hand,* 885 S.W.2d 471, 476 (Tex.App.—El Paso 1994, writ denied) (a binding contract exists when each of the following elements is present: 1) an offer; 2) acceptance; 3) a meeting of the minds; 4) a communication that each party has consented to the terms of the agreement; 5) execution and delivery of the contract with an intent that it become mutual and binding on both parties). Because Borden has, albeit tacitly, stipulated that some sort of agreement existed with W.G., proof of the Borden–W.G. contract's existence is not necessary. In the case of PDI, where the defendant has argued and tendered summary judgment proof showing that no binding agreement existed between PDI and Borden, PDI must tender evidence to demonstrate that a contract did, indeed, exit. *See, e.g., Bridewell v. Pritchett,* 562 S.W.2d 956, 958 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.).

The facts revealed in the summary judgment record fall far short of establishing the elements necessary for the formation of a valid contract between Borden and PDI. Delmar does not describe the offer and acceptance of any particular contractual arrangement. Further, he neither names a single decision-making representative of Borden with which he, in the name of PDI, had a meeting of minds as to contract terms nor tenders any documentation from which to infer such a meeting of the minds. *See Enos v. Leediker,* 214 S.W.2d 694, 695 (Tex.Civ. App.—Galveston 1948, no writ) (a purported contract will not be valid if "the minds of the

parties never met with respect to a material feature of the contract").

PDI's assertion that a contract arose through a "course of dealing" falls flat. The summary judgment evidence establishes that Borden's "dealing" was with W.G., not with Delmar or PDI. W.G. spoke for both business entities and Borden dealt with the Pettigrew brothers, under the name W.G. Pettigrew Distributing Company, as a single entity. Not only did W.G. represent all the Pettigrew interests during negotiations, but when W.G. attempted to sell his business in late 1994, Delmar's routes were included in the sales offer and were not segregated or valued separately. *WGP Dep.* at 339; *DP Dep.* at 265; *Def.'s Ex. F (W.G. Pettigrew's proposed sale of business).* All the evidence leads to one conclusion: PDI did not have a contractual relationship with Borden.

■ W.G.'s breach of contract claim is based on the contention that Borden disregarded their agreement by changing the independent distributors' compensation program and by competing directly with the Pettigrews for certain large accounts, starting around 1988. W.G. argues that the course of dealing between the parties for almost fifty years established the terms of the relationship and, in accordance with this course of dealing, Borden could not unilaterally change the terms of the agreement or terminate him as an independent distributor without cause. Borden counters that W.G. fails to establish, or even raise a genuine fact issue from which to infer, a contract breach. According to Borden, whatever disagreements exist concerning various details of the relationship, the evidence demonstrates that W.G. was an "at will" independent distributor and, as such, the relationship could be terminated by either party at any time without cause. Borden, in other words, offered a series of "take it or leave it" arrangements to W.G. and the other independent distributors. Borden further argues that, even if the contractual relationship was not "at will," by performing and accepting benefits under each of the succeeding changes, W.G. accepted the contract modifications and ratified the new arrangements.

■ Whether an agreement is characterized as an employment contract or a contract for the sale of goods, there is generally no implicit requirement that a party need show "cause" to terminate the relationship. The longstanding rule in Texas provides for employment at will, terminable at any time by either party, with or without case, absent an express agreement to the contrary. *Federal Express Corporation v. Dutschmann,* 846 S.W.2d 282, 283 (Tex.1993) (citations omitted). *See also, e.g., Perez v. Vinnell Corp.,* 763 F.Supp. 199, 200 (S.D.Tex.1991) (may terminate at any time for a good reason, a bad reason or no reason at all). Various state and federal legislative acts limit the "at will" doctrine, but none are relevant to the instant case. *See, e.g.,* 42 U.S.C. § 2000e–2 (discharge based upon membership in specified protected classes); 29 U.S.C. § 623(d) (discharge based upon age). The only judicially-created exception to the "at will" rule in Texas applies when termination is based on the employee's refusal to perform an illegal act. *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985). *Cf. McClendon v. Ingersoll–Rand Company,* 779 S.W.2d 69, 69–70 (Tex.1989), *rev'd,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (noting various exceptions tailored by courts in other states).

Similarly, under the Texas version of the Uniform Commercial Code, where a contract provides for successive performances but is indefinite in duration, unless otherwise agreed it may be terminated at any time by either party. TEX. BUS. & COM.CODE § 2.309(b). Pursuant to the statute, termination requires reasonable notification. *Id.* § 2.309(c). In Texas and other jurisdictions, the supplier-distributor arrangement has been found to be terminable "at will," without good cause, absent a specific contractual agreement to the contrary. *See, e.g., Winters v. Houston Chronicle Pub. Co.,* 795 S.W.2d 723 (Tex.1990) (newspaper distributor) (Texas law) *Anheuser–Busch, Inc. v. Jefferson Distributing Co.,* 353 F.2d 956 (5th Cir.1965) (beer distributor) (Alabama law); *Cherokee Pump & Equipment, Inc. v. Aurora Pump,* 38 F.3d 246 (5th Cir.1994) (commercial pump distributor) (Illinois law); *Delta Services & Equipment, Inc. v. Ryko Mfg. Co.,* 908 F.2d 7 (5th Cir.1990) (vehicle washing equipment distributor; clause that per-

mitted manufacturer to terminate contract immediately if distributor did not meet sales quota was not sufficient to rebut general presumption that contract was terminable at will) (Iowa law).

Both Borden and the Pettigrews point to the depositions of W.G. and Delmar to support their positions. Despite the plaintiffs' efforts, in their summary judgment brief and in their affidavits, to "clarify" the facts, the depositions conclusively establish the "at will" nature of the relationship. *See WGP Dep.* at 51–54; *DP Dep.* at 56–65. First, it is clear that the question of the parties' rights to terminate the contract was never explicitly discussed. Second, the Pettigrews claim that, under the agreement, they could quit distributing Borden products at any time they wished, and concede that, at least before the 1973 memorandum, Borden had the corresponding right to summarily terminate a distributor. In other words, "cause" was not necessary to terminate the relationship. Third, the provisions of the 1973 memo contain nothing to indicate that the "at will" nature of the arrangement was modified.

The Pettigrew depositions, both standing alone and when considered with the other summary judgment evidence, indicate the assertion that Borden needed "cause" to terminate the contract is based on subjective beliefs and not grounded upon an express or implied term of the distributorship agreement. There simply was no "meeting of the minds" concerning incorporation of a "for cause" requirement for termination. *See Bridewell,* 562 S.W.2d at 958 (whether or not there was a "meeting of the minds" is typically a factual determination, however, where there is an absence of probative evidence to establish such, a court may determine there has been "no meeting of minds" as a matter of law).

The only other evidence referred to by the Pettigrews as supporting their position that "cause" was needed for termination of the contract is certain testimony from Darrell Joslin's deposition. The Pettigrews, however, failed to tender the cited deposition transcript pages to the Court, and as a consequence, the purported Joslin proof could not be considered.

The Court is forced to conclude that the agreement was terminable without cause as a matter of law. *See Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1449 (5th Cir.1993); *Forsyth v. Barr,* 19 F.3d 1527, 1533–34 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). If there was a "course of dealing" between the Pettigrews and Borden, it was that the parties either entered into a succession of agreements or that W.G. agreed to a succession of modifications offered by Borden. Because an "at will" contractual relationship can be terminated at any time by either party, one party may, at any time, offer the other party a choice: ratify the modifications or end the relationship. Each time Borden set new prices, modified the financial assistance programs, or changed the policy pertaining to dealing with retail outlets, the Pettigrews had a choice of accepting (by continuing to do business with Borden) or not accepting (by declining to do further business with Borden) the modifications. Changes apparently were announced and there is no evidence that Borden failed to provide sufficient notice to the distributors. On occasion, W.G. negotiated better terms that those initially offered by Borden. W.G.'s reliance on the insupportable theory that, due to the course of dealing, Borden needed "cause" to terminate distributors or to modify the arrangement offered to the distributors, is not supported by the evidentiary record. Moreover, because W.G. accepted and performed pursuant a succession of terms set down by Borden, his actions indicated acceptance of each new contract or ratification of the modifications.

W.G. argues that, at the very least, he never agreed to the final set of terms introduced in 1994. However, the depositions of W.G. and Delmar, as well as the documentary evidence, tell a different story. Although the Pettigrews say they did not "agree" with the terms of the November 11 letter, both W.G. and Delmar concede that, after extended negotiations, they "accepted" the changes because they had "no choice." *See DP Dep.* at 299–303; *WGP Aff.* at 2–3. In fact, however, W.G. clearly had the choice of terminating the distributorship relationship, for that is what he ultimately did.

■ Ratification occurs when a party recognizes the validity of a contract by acting under it, performing under it, or affirmatively acknowledging it. *Wetzel v. Sullivan, King & Sabom, P.C.,* 745 S.W.2d 78, 81 (Tex. App.—Houston [1st Dist.] 1988, no writ); *United States v. McBride,* 571 F.Supp. 596 (S.D.Tex.1983), *aff'd,* 915 F.2d 1569 (5th Cir. 1990). Borden and W.G. exchanged correspondence referring to an agreement on new contractual terms and W.G. performed, as well as accepted benefits, pursuant to the new agreement. The Pettigrews did not dispute the agreement's validity until W.G. decided to terminate the relationship with Borden. Because W.G. accepted compensation under the agreement and treated the agreement as valid until the distributorship was terminated, ratification was established as matter of law.

■ To the extent W.G. asserts that Borden should still be held liable for amounts due pursuant to earlier, superseded, arrangements, the claim fails because W.G. does not specify facts establishing that any particular contract breach resulted in identifiable damages. Borden also raises the defense of accord and satisfaction. An accord is merely an agreement whereby one party agrees to give or perform and the other to accept something other than or different from what he is, or considers himself to be, entitled to. *City of Houston v. First City,* 827 S.W.2d 462, 472 (Tex.App.—Houston [1st Dist.] 1992, writ denied). A satisfaction is the performance of such an agreement. *Id.* The elements of accord and satisfaction are well established under Texas law: there must be a new contract, express or implied, and the evidence must establish the existence of mutual assent between the parties. *Id. (citing Industrial Life Ins. Co. v. Finley,* 382 S.W.2d 100, 104 (Tex.1964) and *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969)). No doubt, with the very viability of his business in question, W.G. faced a difficult situation when Borden decided to curtail the compensation package available to distributors. Nonetheless, after negotiations, an agreement was reached and W.G. began to perform under the new terms. W.G. sought recompense for services already performed and the agreement reached provided for, and W.G. accepted, retroactive payments. *See WGP Dep.* at 359–61. As a consequence, whatever bona fide dispute there existed between the parties as to liability for the amount allegedly due, and even if W.G. contends he accepted less than he believed he was due, by accepting the agreed-upon payments W.G. is bound by an accord and satisfaction.

■ Underlying the breach of contract claim is the notion that the Pettigrews' were treated unfairly after 50 years of faithfully working, and cultivating business, for Borden. The Pettigrews seem to insinuate that their course of dealing with Borden gave rise to an implied duty of good faith and fair dealing which incorporated into the contract a requirement that Borden could terminate, or change the terms of the relationship, only "for cause." To create a special duty to act in good faith, however, there must be a "special" or "confidential" relationship between the parties. *See Electro Associates, Inc. v. Harrop Constr. Co.,* 908 S.W.2d 21, 22 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 n. 5 (Tex.1992)).

The fact that a relationship has been a cordial one, and of long duration, does not in itself give rise to a confidential or special relationship. *Hallmark v. Port/Cooper–T. Smith Stevedoring Co.,* 907 S.W.2d 586, 592 (Tex.App.—Corpus Christi 1995, no writ). Mere subjective trust and a cordial friendship are insufficient to state a cause of action. *Id.* In the context of the supplier-distributor relationship, Texas courts have held that no special relationship exists to warrant imposition of a duty of good faith and fair dealing on the supplier. *See, e.g., Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477 (Tex.App.—Corpus Christi 1989, writ denied); *Taylor v. American Petrofina Co. of Texas,* 1992 WL 41725 (Tex.App.—Dallas 1992, no writ). *See also Dutschmann,* 846 S.W.2d at 284 n. 1. (Texas Supreme Court expressly rejected an invitation to recognize such an implied covenant in the context of employment relationships); *Crim Truck & Tractor,* 823 S.W.2d at 596 (no special relationship between franchisee and franchisor).

The Court is forced to conclude that the Pettigrews have failed to demonstrate that provisions of any agreement between Borden and W.G. or Borden and PDI were violated. Moreover, the Pettigrews have been unable to specify damages flowing from any particular alleged contract breach. Because the Pettigrews have not made a showing sufficient to establish the existence of all elements essential to their causes of action, on which they would bear the burden of proof at trial, summary judgment will be granted on the breach of contract claims.

*Conversion*

■■■ Conversion is the wrongful exercise of dominion and control over another's property in denial of or inconsistent with the owner's rights. *Bandy v. First State Bank,* 835 S.W.2d 609, 622 (Tex.1992). In order to prevail, the plaintiffs must show that, at the time of the conversion, they were the legal owners, had legal possession, or were entitled to legal possession of the property. *Whitaker v. Bank of El Paso,* 850 S.W.2d 757 (Tex.App.—El Paso 1993, no writ). Additionally, they must demand return of the property and demonstrate the defendant's refusal to do so. *Id.*

■■■ The conversion claim is based on the premise that Borden "wrongfully took control over" the Pettigrews' customers and the contractual rights associated with those customers. Borden is accused of converting the Pettigrews' right to sell and set prices with their customers, thus depriving the plaintiffs of future profits and sales to these customers. The Pettigrews do not allege conversion of any tangible property.

■■■ The summary judgment record demonstrates that a cause of action for conversion is not available to the Pettigrews. As proof that they had special "rights" associated with a specific geographic territory, the Pettigrews point to Borden's practice of referring potential customers to distributors based in large part on the geographic regions each distributor served. But they fail to specify, precisely, what property allegedly was converted. As evidenced by the 1973 memo, as well as by statements found in the deposition transcripts, it is clear that distributors did not "own" specific customers or geographic territories. *See also Taylor,* 1992

WL 41725 at *2 (*citing* Tex.Bus. & Com.Code § 15.05; *Sherrard v. After Hours, Inc.,* 464 S.W.2d 87, 89 (Tex.1971)) (exclusive-territory distributorships illegal). Moreover, Texas law does not, as a general rule, recognize the conversion of intangible contract rights, the exception being conversion of a document in which such rights have been merged. *See Grynberg Production Corp. v. British Gas, p.l.c.,* 817 F.Supp. 1338, 1348 (E.D.Tex.1993). Because no documentation of the alleged contractual rights was created, the Pettigrews' claim cannot fall within the general rule's exception.

The Court notes with some bewilderment the Pettigrews' argument that, "as the law in this area appears to be in dispute, the prudent action for the trial court is to refrain from ruling on plaintiffs' claims for conversion until after trial on the merits when the factual record in this matter is fully developed." *S/J Response* at 20. The Pettigrews apparently want to argue at trial that all intangible property rights, not only those associated with a document, are subject to conversion. However, because the purpose of trial is to resolve questions of fact, it is not at all clear how setting this matter for trial could resolve a question of Texas law. Inasmuch as the conversion claim has no factual support and the Pettigrews' legal arguments are unpersuasive, the Court will not defer consideration of this issue for trial. The conversion cause of action will be dismissed.

*Tortious Interference with Contract*

■■■ The elements of tortious interference with a contract are: 1) the existence of a contract subject to interference; 2) a willful and intentional act of interference; 3) the act was a proximate cause of the plaintiff's damages; and 4) actual damage or loss. *Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex. 1995). If these elements are established, the defendant must prove there existed a legal justification or excuse for its interference with the contractual relationship. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989).

■■■ Nowhere in the deposition transcripts or the miscellaneous documentary evidence tendered by the Pettigrews is there any evidence of contractual relationships

which were subject to interference. The plaintiffs declare that they had "contractual or business relationships" with a number of grocery and other retail outlets. But none of these relationships are described. Neither the affidavits nor the depositions cited by the Pettigrews in support of their tortious interference claim provide even a hint as to the terms of these alleged contracts. *See Young Dep.* at 140; *Conaway Dep.* at 186–88; *Stripling Dep.* at 144–47. Accordingly, even accepting the facts related in the affidavits as true, the Pettigrews fail to establish the first element of their cause of action. A generalized allegation that a "business or contractual relationship" exited is inadequate. There must be some evidence of the terms of each agreement allegedly subject to interference to determine whether the particular contract in question could possibly, as a matter of law, be subject to interference.

■ The Court parenthetically notes that even had the Pettigrews pleaded interference with a business relationship, a tort similar to contractual interference where it is not necessary to establish the existence of a valid contract, the claim would fail because none of the evidence indicates that Borden's actions were motivated by malice. *See CF & I Steel Corp. v. Pete Sublett & Co.*, 623 S.W.2d 709, 714–15 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Thus, even liberally construing both the pleadings and the facts in the Pettigrews' favor, the tortious interference claim is subject to summary dismissal.

*Unfair Competition*

■ The gist of a cause of action based on unfair competition is the appropriation of a competitor's business to his injury. *Hudgens v. Goen*, 673 S.W.2d 420, 423 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (*citing Plaza Co. v. White*, 160 S.W.2d 312, 313–14 (Tex.Civ.App.—San Antonio 1942, writ ref'd)). As usually stated, the doctrine of unfair competition rests on the broad equitable principle that no person may sell or advertise his own business or goods as those of another. *See, e.g., Swanson Broadcasting, Inc. v. Clear Channel Communications, Inc.*, 752 S.W.2d 165, 168 (Tex.App.—San Antonio 1988, writ dism'd) (citing *McCarley v. Welch*, 170 S.W.2d 330, 332 (Tex.Civ.App.—Dallas 1943, no writ)). Typically, unfair competition

is use or simulation by one person of the name, symbols or devices of a business rival in such a manner as is calculated to deceive and cause the public to trade with the first when they intended to and would otherwise have traded with the second. *Id.* (citing *Avnet v. Texas Centennial Central Exposition*, 96 S.W.2d 685, 687 (Tex.Civ.App.—Dallas 1936, writ dism'd)).

■ It is legitimate and does not constitute unfair competition for a person or firm to appropriate to itself all the customers it can obtain even to the extent of driving its competitor out of business, provided the means used to do so do not contravene any law or violate a definite legal right of such a competitor. *Schoellkopf v. Pledger*, 778 S.W.2d 897, 902 (Tex.App.—Dallas 1989, writ denied). *See also United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) (antitrust action). Borden asserts that the Pettigrews had no legal right to prevent competition from Borden or from anyone else. The Pettigrews, in their response to the summary judgment motion, provide no arguments to support their unfair competition claim and tender no evidence, whatsoever, concerning this issue. Without some finding of an independent substantive tort or other illegal conduct, liability cannot be premised on the tort of "unfair competition." *Schoellkopf*, 778 S.W.2d at 904–5. Because the record is devoid of evidence supporting the plaintiffs' claim, summary judgment will be granted.

*Predatory Pricing*

■ Predatory pricing is the practice whereby a business enterprise charges a price so low that it incurs a loss, but does so with the expectation of driving out competition and being able to charge a significantly higher price in the future. The Texas Supreme Court, after examining case law from sister states and relying heavily on federal labor law precedents, articulated the elements of a predatory pricing cause of action under Texas law:

[The] test for predatory pricing [is]: (1) the seller has an objectively reasonable expectation of recouping its losses due to the alleged predatory pricing by charging

higher prices later, that is, the predatory pricing is economically feasible; and (2)(a) the price charged is below average variable cost; or (b)(i) there are substantial barriers to market entry; (ii) the seller is charging a price below its short-run profit-maximizing price and its average total cost; and (iii) the benefits of the seller's price depend on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. *Caller-Times Publishing Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 588 (Tex. 1992).

 The Pettigrews fail to allege, must less tender proof to establish, a single element required for this cause of action. Apparently W.G. and Delmar presume that predatory pricing occurred when Borden charged certain large grocery store chains less for milk products than the "dock price" charged to independent distributors. Merely charging different prices to different customers, however, does not constitute predatory pricing and is not actionable. Predatory pricing occurs only when the seller has at least some monopoly power, and a plaintiff asserting a predatory pricing claim must demonstrate sales at a price below average variable or average total cost.

Daniel J. Slotte, an economics professor at Southern Methodist University, was engaged by Borden to investigate the predatory pricing claim. After analyzed milk product sales data from Matagorda and Brazoria Counties—the counties served by the Pettigrews during the relevant time period—he concluded that the Pettigrews' claims were "speculative, inconsistent with sound economic principles, and without empirical foundation." *Slotte Dep. (Def.'s Ex. J)* at 8. In light of the complete absence of material facts supporting the Pettigrews' position, the Court finds the assertion of predatory pricing not merely odd, but positively absurd. Accordingly, the cause will be dismissed with prejudice.

*Slander*

 Slander is a defamatory statement orally communicated or published to a third party without legal excuse. *Glenn v. Gidel,* 496 S.W.2d 692, 697 (Tex.Civ.App.—Amarillo 1973, no writ) *See also Diesel Injec-*

*tion Sales & Services, Inc. v. Renfro,* 656 S.W.2d 568, 573 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). PDI accuses Borden of slander *per se* based upon allegations that a Borden salesman made comments to the effect that the Pettigrews were retiring and getting out of the dairy business. To be actionable as slander *per se,* the statement or statements must be either so inflammatory or obviously injurious as to make proof of their injurious character unnecessary. *See Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 920–21 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.).

Based upon the record before the Court, it is clear why the Pettigrews failed to address the slander claim in their response to Borden's summary judgment motion and have moved for dismissal of this cause of action: the record contains no competent evidence on which to base the claim. Only hearsay found in Delmar Pettigrew's deposition transcript supports the slander allegation. Because Delmar has offered no reason or argument to explain why the statements should be excepted from the hearsay rule, the Court has ruled the evidence inadmissible.

 Even if the hearsay nature of Delmar's deposition statements had been ignored and the testimony conceded to be true and correct, the evidence still would be insufficient to establish a slander claim. First, Delmar's failure to specify damages is fatal to his claim. *See Id.* at 921. Second, Delmar's deposition does, not provide enough information for the Court to gauge the context of the statements. Whether statements are capable of defamatory meaning is initially a question of law for the court. *Simmons v. Ware,* 920 S.W.2d 438, 443 (Tex.App.—Amarillo 1996, n.w.h.). *See also McKethan v. Texas Farm Bureau,* 996 F.2d 734 (5th Cir. 1993), *cert. denied,* 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994) (statements not slanderous as a matter of law where no reasonable jury could find so) (Texas law). The alleged slanderous statements must be construed as a whole, in light of the surrounding circumstances or context in which a person of ordinary intelligence would understand the statements. *Tucker,* 806 S.W.2d at 920. Delmar, however, cannot enlighten the Court

on this matter. He was not present at the time the allegedly slanderous statements were made and he, at best, could only speculate about the relevant surrounding circumstances. Because PDI has the burden of proof on the slander claim and does not demonstrate a basis for the allegations, the slander cause of action will be dismissed with prejudice.

### Statute of Limitations

Borden contends that many, if not all, of the Pettigrews' claims are time barred. Inasmuch as the various causes of action are based upon behavior Borden first exhibited in 1988, some claims would appear to be time barred. *See* TEX.BUS. & COM.CODE § 2.725(a) (sales contracts governed by four-year limitations statute); *Sun Medical, Inc. v. Overton,* 864 S.W.2d 558 (Tex.App.—Fort Worth 1993, no writ) (employment contracts governed by four-year limitations statute); *Coppock & Teltschik v. Mayor, Day & Caldwell,* 857 S.W.2d 631, 639 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (*citing First Nat'l Bank of Eagle Pass v. Levine,* 721 S.W.2d 287, 289 (Tex.1986)) (tortious interference claim governed by two-year limitations statute); *Martinez v. Hardy,* 864 S.W.2d 767, 774 (Tex.App.—Houston [14th Dist.] 1993, no writ) (*citing* TEX. CIV. PRAC. & REM.CODE § 16.002) (slander claim governed by one-year limitations statute).

Matters such as the statute of limitations defenses typically are addressed by a court prior to analysis of the plaintiffs' claims. The difficulty with determining whether the limitations statutes apply in the instant case is the absence, in the evidentiary record, of information indicating precisely when various transactions and occurrences forming the bases of the alleged claims occurred. The problem is largely due to the vagueness of the plaintiffs' allegations. Borden, however, has the burden of demonstrating the applicability of the limitations defense on summary judgment. *Ray v. O'Neal,* 922 S.W.2d 314, 316 (Tex.App.—Fort Worth 1996, n.w.h.) (*citing Zale Corp. v. Rosenbaum,* 520 S.W.2d 889, 891 (Tex.1975)). Borden neither cites the relevant limitations statutes nor develops an adequate record indicating the dates Borden's conduct allegedly constituted the grounds for the Petti-

grews' claims. Because the Court has already determined that the Pettigrews failed to establish the elements of their causes of action, the Court will not scrutinize the limitations defenses.

### Conclusion

The Pettigrews' beef with Borden stems from W.G. and Delmar's beliefs that Borden somehow betrayed them by instituting policy changes that had a ruinous effect on their business enterprises. The Pettigrews want to make hay of the fact that they loyally distributed Borden products for fifty years, insinuating that as a result of the long relationship, Borden and the Pettigrews' should have felt and acted as if they had a stake in each others businesses. Viewed objectively, however, it is utterly ridiculous to expect that Borden's owners would not try to milk their business for the maximum possible profit.

Borden apparently skimmed the biggest and best customers for their own account, butchered the compensation packages offered to the distributors, and steered some prospective customers to their own salesmen. But, whatever unflattering terms the Pettigrews may use to brand Borden's actions, Borden broke no law or contract provision. Further, it is noteworthy that, by the Pettigrews' own accounts, Borden began bullying the distributors into accepting unfavorable terms starting in 1988. Yet, suit was not filed until 1995.

The Court has reviewed the summary judgment evidence in the light most favorable the Pettigrews, and drawing all justifiable inferences in their favor, the Court finds that no reasonable jury could find in favor of the Pettigrews. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2505, 2510–11, 91 L.Ed.2d 202, 212 (1986). Accordingly, the Court finds in favor of the movant and it is,

ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

### ORDER ON MOTION TO ALTER OR AMEND JUDGMENT

Before the Court is Plaintiffs' Motion to Alter or Amend Judgment Pursuant to Rule

59(e) of the Federal Rules of Civil Procedure. On August 30, 1996, Defendant's Motion for Summary Judgment was granted and the Court entered a Final Judgment dismissing all causes of action against Defendant Borden. In the instant motion, Plaintiffs W.G. Pettigrew Distributing Company and Pettigrew Distributing Company, Inc., ask the Court to reconsider the award of summary judgment. The Pettigrews seek to introduce evidence, bearing on the breach of contract claim, which they failed to tender prior to the Court's determination that Borden was entitled to summary judgment. They also reiterate most of the arguments previously presented in the brief filed on March 19, 1996, in response to Borden's summary judgment motion.

 Rule 59(e) has been interpreted as covering motions to vacate judgments, not just motions to modify or amend. *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 354–55 (5th Cir.1993); *Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962). In deciding whether to reopen a case under Rule 59(e), the district court has considerable discretion. *Bohlin*, 6 F.3d at 354. This discretion, however, is not without limit and the court must strike the proper balance between two competing imperatives: 1) finality and 2) the need to render just decisions on the basis of all the facts. *Id.*

The Pettigrews want the Court to consider portions of Darrell Joslin's deposition testimony which were not tendered prior to the award of summary judgment. These deposition excerpts, although cited in the brief filed by the Pettigrews in response to Borden's summary judgment motion, were not submitted with their brief. The Pettigrews contend that Joslin's statements raise a fact issue concerning the "at will" nature of the business relationship between Borden and the Pettigrew companies.

 When presented with requests to reopen evidence under Rule 59(e), "district courts in their discretion may consider new materials in order to render a just decision on the basis of all the facts." *Fields v. City of South Houston*, 922 F.2d 1183, 1188 (5th Cir.1991). *Cf. Bohlin*, 6 F.3d at 356 (Rule 60 standard more stringent than Rule 59(e) standard). If a party seeks to upset a summary judgment on the basis of evidence that was not timely presented, the district court must balance the following factors: 1) the likelihood that the non-moving party will suffer prejudice if the motion to alter is granted; 2) the reasons for the failure to file the evidence in a timely fashion; 3) whether the evidence was available before the summary judgment decision was made; and 4) the importance of the evidence to the moving party's case. *See Hale v. Townley*, 45 F.3d 914, 921 (5th Cir.1995) (*citing Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 175 (5th Cir.1990), *cert. denied*, 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993)).

 In the instant case, only the first factor favors reopening the case. Borden would not be prejudiced if the Court considered the additional evidence. Even if the evidence was capable of impacting the outcome of the case, it would not be a surprise, or unfair, to Borden if the Court considered the tardily-tendered pages of Joslin's deposition. These deposition excerpts were expressly cited by the Pettigrews in their summary judgment response, Borden's counsel was present during the deposition, and presumably Borden had its own copy of the deposition transcript.

The other three factors, however, do not favor reopening the case based upon the additional evidence. Although the Pettigrews never specifically address the cause of the failure to timely file all the relevant Joslin deposition pages, counsel's carelessness apparently was the reason. As a consequence, the second and third factors weigh against the Pettigrews. The fourth factor goes to the substantive value of the offered evidence. After carefully reviewing all portions of the Joslin deposition now before the Court, including both the material tendered with the summary judgment briefs and the pages submitted late, the Court finds that the Pettigrews still fail to raise a material fact issue, as required to avert summary judgment. After considering and balancing all the factors, the Court must conclude that Rule 59 relief based upon the additional evidence is not appropriate.

 Other than discussion aimed at convincing the Court to allow the additional

Joslin deposition excerpts into evidence, the Pettigrews' Rule 59 motion simply reiterates arguments presented to, and considered by, the Court prior to the granting of summary judgment in favor of Borden. Typically, Rule 59 motions should not be used to relitigate old issues. *See, e.g., Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986). Because the Pettigrews' motion does not demonstrate a manifest error of law or mistake of fact, the Court finds no basis for Rule 59 relief. *See, e.g., Ramos v. Boehringer Manheim Corp.*, 896 F.Supp. 1213, 1214 (S.D.Fla.1994), *aff'd*, 66 F.3d 346 (Fed.Cir. 1995) (citing 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil § 2804 (1973); 6A Moore's Federal Practice § 59.07 (1993)). *See also Estate of Pidcock v. Sunnyland America, Inc.*, 726 F.Supp. 1322, 1333 (S.D.Ga.1989) ("courts have distilled three major grounds justifying reconsideration: an intervening change in controlling law, the availability of new evidence, and the need to correct clear error or prevent manifest injustice"). Accordingly, it is,

ORDERED that Plaintiffs' Motion to Alter or Amend Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure is DENIED.